HARVEY B. HURD, impleaded, etc., Plaintiff in Error, *v.* JOSEPH H. EATON, and SUSAN EATON, Defendants in Error.

ERROR TO THE SUPERIOR COURT OF CHICAGO.

A court of chancery may compel a judgment creditor to exhaust all the property held by his debtor, before he shall resort to property purchased of the debtor, but subject to the lien of the judgment.

Where there are two funds or pieces of property to which one creditor may resort, while another creditor can only resort to one, he who has the double resort, must proceed first against the property to which the other cannot resort.

Where a judgment creditor may collect from property that his debtor has not conveyed, but refuses or fails to do so, he may be enjoined from proceeding against the grantee of his debtor.

THIS was a bill in chancery to enjoin Hurd from enforcing two judgments in his favor against his co-defendants below, upon property owned by Robert L. Dunlap at the time of the judgments, and subsequently sold to Blaney, and by him conveyed to Susan B. Eaton.

Bill alleges that, on the 6th of December, 1856, Robert L. Dunlap was owner of block forty-seven of Evanston, and on that day deeded same to Blaney, by warranty deed, for $3,000. That on the 17th of October, 1857, Blaney conveyed to Susan B. Eaton, the south half of said block; and on the 11th of October, 1858, conveyed to her the remainder. That previous to the sale to Blaney, there were the following judgments: Lee against Dunlap and Hurd, October 28, 1856, $1,021.76; Brooks against Dunlap, October 29, 1856, $632.94; Cooley against Sanford, Colburn & Dunlap, November 5, 1856, $611.41; Strong against Dunlap & Sanford, September

10, 1856, $223.30; Wilcox *et al.* against Dunlap, Hurd & Wright, November 6, 1856, $506.71; Wilcox *et al.* against Dunlap, Colburn & Hurd, November 6, 1856, $657.44; and up to June, 1857, he was unaware of said judgments. He then employed F. H. Benson to procure discharge of the judgments, and that Benson induced Hurd to pay all judgments that he was party defendant to, and purchased the others. Benson insisted that the judgments should be satisfied. Hurd wanted to keep the judgments alive, to enforce them against Dunlap. Benson annexed as condition to his assent to this, that the block should be sold on all the above judgments; and that on the 6th of July, 1857, it was sold to Benson. That previous to the 20th of May, 1856, Hurd, Colburn & Dunlap were partners in a planing mill, etc. That on the 20th of May, 1856, Hurd sold out to Thomas L. Sanford, who thereupon took the place of Hurd, in the firm; that as part consideration, Sanford agreed to pay Hurd's share of the joint liabilities; that about the 2nd of June, Hurd feared he would violate his contract, and leave Dunlap, Colburn & Hurd to pay all liabilities, and it was agreed by Dunlap, Colburn & Hurd, in order to hold Sanford to his contract, the new firm should make to Hurd a note for $354, payable at two months; and though the same was made, nominally, for Hurd's benefit, it was really for the benefit of Hurd, Dunlap & Colburn; that Hurd agreed to use the note against Sanford, when necessary to compel him to pay his share of the debts of the firm, and never to use it against Dunlap & Colburn; and that Dunlap & Colburn signed it in pursuance of that agreement; that Hurd induced Sanford to sign it thus: Hurd held a note of Dunlap, Wright & Co. for $300, of which Hurd, Dunlap & Colburn were members, and represented to Sanford, that it was one of the debts that belonged to him to pay, and presented the judgment note, signed by Dunlap & Colburn, as a substitute, claiming the $54 as interest, at twenty per cent. per annum, who perceiving the signatures of Dunlap & Colburn to the note, signed it. That the note surrendered by Hurd had been previously two-thirds paid up, and as Hurd owned four-ninths of the business of Dunlap

Wright & Co., and was liable for that proportion of the debts, not more than $56 was then due on the note; that the note was fraudulent and void. That on the 3rd of September, 1856, Dunlap & Colburn paid Hurd $48.50, to apply to the $300 note which, with the disputed interest would overbalance the note.

That when Hurd sold to Sanford, Aaron Miller held a note for $500 against Dunlap, Wright & Co., and on the 2nd of June, 1856, Dunlap, Colburn & Sanford made a note to Hurd, for Miller's benefit, for that amount, due in one month, at ten per cent. interest, which was afterwards indorsed to I. Speer, and paid in full by Dunlap, Colburn & Sanford, and delivered to Dunlap & Colburn. That Sanford failed to help pay the debts of the firm, and in October, 1856, Hurd applied to Dunlap & Colburn for permission to enter up judgment on the $354 and $500 notes, which was granted. Hurd agreeing to use the judgments and execution against Sanford only; that judgments were accordingly entered on the 15th of October, 1856, on both notes; that they were void, or the joint property of Hurd, Dunlap & Colburn, and no lien on individual property.

That at the time Blaney purchased, these judgments in favor of Hurd were outstanding and apparent liens on said block; that Hurd knew Blaney was about to purchase, and did not inform him of the judgments; that since purchase, Blaney and Eaton have made improvements valued at $12,000, which Hurd has seen progressing without informing them of his lien. That Hurd has waived his lien by his silence; that on the 31st of August, 1858, Hurd redeemed the block from the sale to Benson, by virtue of executions on his two judgments, and advertised, sold and bid in the same for $28.05, amount of redemption money; that the block was sold in gross as the same had previously been sold on the six executions; that the property was subdivided into twelve lots, and there were two homesteads on it.

Insists that both sales were void; that Hurd's execution was without the seal of the court, and sale void; that the redemption was from sale on the Strong judgment, when sale was really on the six executions.

That first sale being on the six executions, part of which were against Hurd, Hurd had no right to redeem. Hurd's judgments are a cloud on the title.

Prays Hurd's judgments and redemption be declared void, and he enjoined from issuing executions on the same to affect said block, or commencing ejectment suit; that Hurd quit claim to Eaton.

Bill makes Hurd, Benson, Dunlap, Colburn & Sanford defendants.

It appears that Benson and his assignees, on the 4th of January, 1858, quit claimed the block to Blaney; claims that that was a full redemption by Blaney, from the sale to Benson.

Hurd answers, admitting the conveyance to Blaney, and from him to Eaton; that the judgments were liens, in the order of their dates, his coming next to that of Strong; admits that·Blaney employed Benson as his agent; that Benson acted as the agent of Dunlap, in making the sale to Blaney, and represented the same as free and clear, when they were not; don't know whether Blaney knew of the liens, but they were of record, and legal notice to all purchasers; denies that Benson induced Hurd to pay off the judgments, or that Benson took an assignment of them, on condition that the block should be sold for the purpose stated; denies knowledge of sale till after it took place; that Benson was Hurd's banker and confidential friend; that the Lee and Wilcox judgments were levied on Hurd's property in his absence East. On his return, the 18th of February, 1857, he bought up the Lee judgment and had it assigned to Benson, with the understanding that it should be made out of any property of Dunlap's which it might be a lien upon, for Hurd's benefit; and on July 16, 1857, one Hitchcock bought up the Wilcox judgments, borrowing the money from Benson to do it, and assigned them to Benson as collaterals; and afterwards Hurd bought them of Hitchcock, paying for them the money borrowed of Benson, and Benson was to hold them for the purpose of enforcing them against any property of Dunlap's; denies that it was avowed to be any part of Benson's purpose

to relieve block forty-seven; that the Lee judgment was assigned to him before he was employed by Blaney or Eaton, as stated in the bill. If he had any such purpose, at any time, he studiously kept it from Hurd, while he pretended to act as his friend.

That the Lee judgment was got on note that was signed by Hurd as surety for Dunlap, Colburn & Co., and Hurd received no part of the proceeds, and had a right to be subrogated to Lee's rights; that the Wilcox judgments, Dunlap, Colburn & Sanford should have paid, and were in part fraudulent against Hurd.

Hurd sold out to Sanford 20th of May, 1856, he taking Hurd's place in the firm; that the business was continued by Dunlap, Sanford & Colburn without any rest in their books of account, or account of stock, till some time after the giving of the notes to Hurd, when they dissolved.

When the notes were given to Hurd, there was no dissatisfaction; that Dunlap, Colburn & Sanford, executed the $354 and $500 notes freely, and without objection, or any representation on the part of Hurd, that the $354 note was for money loaned the previous firm by Hurd, for which he held their note; that the $500 note was for money due Aaron Miller; that Dunlap mentioned the account against Hurd, and wanted it allowed on first note, which Hurd refused, he having an account for legal services against the firm, which he would adjust. Denies all understanding that the $354 note was to be used against Sanford only, or for any purpose except as appeared on its face; denies all fraud, or that anything was paid on the note; admits the $500 note was to obtain further time from Miller, and was indorsed to Speer; denies that it was paid by Dunlap, Colburn & Sanford, but says it was paid by Dunlap out of the money raised on the Lee note, and that it was delivered by Dunlap to Hurd as collateral against his signature on the Lee note, and it was so done to retain Sanford's liability, he having gone out of the firm then. Says, when Dunlap failed to pay the Lee note, Hurd applied to him to know what should be done, and Dunlap requested judgment entered on the $500 note, and Hurd immediately entered judgment on

both notes. Denies all agreement that they were to be enforced only against Sanford; denies fraud, and insists judgments are valid lien.

Hurd insists that the court cannot inquire into the matters in regard to the notes; denies Hurd knew Blaney was about to purchase the block, or that he had purchased it for a long time after. The improvements were mostly put on the block after Blaney and Eaton had actual notice of Hurd's liens. Hurd urged his claim to Benson, as Blaney and Eaton's agent, and Benson prevailed on Hurd to delay, saying he would enable him to get the money out of other property. After Hurd learned of the sheriff's sale to Benson, Benson agreed to assign the certificates to Hurd; that on the 30th of August, Benson refusing to do so, and saying the property had not been redeemed by any person, Hurd sued out executions and redeemed the property, and sold the same in gross as charged. Says the writ was amended by order of the court, by adding the clerk's signature, November 10, 1858; denies that the sale to Benson was made on any but the Strong execution; denies that Blaney redeemed the same by deed of 5th of January, 1858.

The decree sets forth that the objections of defendant Hurd to the competency of the testimony of F. H. Benson were sustained, and to the testimony of Dunlap & Colburn, were overruled. That it appears from the bill, answer and testimony, Dunlap made warrantee deed to Blaney of block forty-seven, aforesaid, and on the 17th of October, 1857, conveyed half the block to Eaton, and on the 11th of October, 1858, conveyed to him the remaining half; that on the 6th of July, 1857, the sheriff sold the block to Benson on the six executions mentioned in the bill, for $25; that on the 15th of October, 1856, Hurd caused two judgments to be entered in the Common Pleas Court, in his favor, against Dunlap, Colburn & Sanford; the first for $385, and the second for $543. Hurd caused executions to be issued the same day; that Dunlap had property out of which the same could have then been made; that Hurd had then returns unsatisfied; that on 31st of August, 1858, Hurd caused alias execution to issue on the $385 judg-

ment, and attempted to redeem block forty-seven from sale to Benson, depositing $28.05, the amount of redemption money, with the sheriff, on the 23rd of October, 1858; that the sheriff sold the same to Hurd, and executed to Hurd a deed for the block; that the sale was set aside by the court November 4th, for informalities; that said judgment was entered on the $354 note, dated June 2, 1856, which was wholly without consideration; and that the $543 judgment was on the $500 note, which had been fully paid, and nothing was due on either of them when judgment was entered; that the judgment was entered thereon by express agreement between Dunlap, Colburn & Hurd; that the said judgment should be enforced against Sanford only, and not against any property of Dunlap or Colburn.

Therefore, ordered that the apparent liens on block forty-seven, and the said judgments, so far as they affect said block, are wholly void; that Hurd be enjoined from issuing said execution on them, or enforcing those now issued, and that he pay the costs of this suit.

The errors assigned are as follows:

That the court below erred in overruling the objection to the testimony of Dunlap & Colburn.

The court erred in admitting their testimony to contradict and explain their written contracts.

The court erred in receiving the testimony of Dunlap & Colburn, to show that they and Hurd undertook to defraud Sanford, and thus relieve themselves from their contracts.

That the decree is unsupported by the evidence.

The decree is against equity.

HURD, BOOTH & POTTER, for Plaintiff in Error.

Cited, 19 Wendell, 608; 1 Rawle, 311; Edwards on Bills, etc. 313, 314; 1 Davis, 400; 13 Wendell, 527; 14 Illinois, 291; 3 Wash. 475; 1 Bland, 333; 16 Illinois, 214; 16 John. 189; 7 John. 161; 1 and 2 Ohio, 219, 356; 36 N. H. 39.

WILLIAMS & WOODBRIDGE, for Defendants in Error.

In cases where both parties are *in delicto* concurring in an

illegal act, it does not always follow that they stand in *pari delicto*, for there may be and often are very different degrees in their guilt. One party may act under circumstances of oppressive *imposition*, hardship, *undue influence* or great *inequality of condition* or age, so that his guilt may be far less in degree than that of his associate in the offense. Story's Equity Jurisprudence, p. 306; *Smith* v. *Burnley*, Doug. R. 696; *Burning* v. *Morris*, Cooper R. 790; *Osborn* v. *Williams*, 18 Vesey, 379; *Boserquet* v. *Dashwood*, Cas. T. Tobb. 37, 40, 41; *Chesterfield* v. *Jansen*, 2 Vesey, 156, 127.

The rule of equity which deprives those who participate in a fraud of any relief, applies only to cases where the parties are " truly in *pari delicto*." 1 Story's Equity Jurisprudence, § 299.

The court will not enforce a usurious contract in favor of the lender, but will interfere at the instance of the borrower. Ibid., § 301.

When the parties are not in *pari delicto*, and the more excusable of the two sues, equity will relieve, though against an executed conveyance. Adams' Equity, p. 418, note 1.

Blaney had a right to have the judgments satisfied out of Dunlap's remaining property.

" A judgment creditor is not entitled in equity to enforce the payment of the judgment against the land of a subsequent purchaser as long as there is a sufficient property of the debtor remaining unsold to satisfy the judgment. And the creditor in such case is entitled to the land of the purchaser to the extent only of his debt which may remain unpaid after the estate of the debtor has been exhausted." *Clowes* v. *Dickinson*, 5 Johns. Ch. 235; 9 Cowen, 405.

Different parcels of mortgaged premises which have been sold at different times subsequent to the mortgage, should be charged in the inverse order of their alienation, and that even in the grantee of the alienee. 6 Paige, 35.

Hurd had full notice of the alienation to us, and he ordered the sheriff to return the executions in no part satisfied, the effect of which was to release his lien upon the mill property, which was personal, and subsequently, by distinct agreement

with Otis, he deferred his judgment to $1,100 of the Otis and Davenport claim upon the Chicago avenue property, which operated as a release of security to the extent of $1,100. *Holden* v. *Pike*, 25 Maine, 427; *Allen* v. *Clark*, 17 Pick. 47.

The order to return the execution is evidence of collusion between debtor and creditor sufficiently to defer the latter to us as subsequent purchasers. *Arlus* v. *Stanbridge*, 5 Rawle, 286.

The court will place a subsequent purchaser upon the footing of a subsequent execution creditor. *Russell* v. *Gibbs*, 5 Cowen, 394; *Powers* v. *Van Buren*, 7 Cowen, 560; *Row* v. *Barber*, 3 Cowen, 279.

In *The Commonwealth* v. *Strumback*, 3 Rawle, 344, the court, Rogers, J., says: "But if the intention of the parties was fraudulent, or the object of the arrangement was the security for a debt, the lien of the execution was gone as respects third persons, whether *purchasers* or execution creditors. The object of an execution is the satisfaction of a debt, and not security for it."

The question is not one of notice, for the subsequent purchaser has notice of the execution in the case of personal property. The sole question is one of collusion between the judgment debtor and his creditor, the law presuming from a stay of the execution, that it was issued not with a view to satisfaction, but to stand as security either to debtor or creditor. 3 Wash. C. C. R. 60.

WALKER, J. It appears from the evidence in this case, that the plaintiff in error, after Dunlap had sold the property to Blaney, directed his executions against Dunlap to be returned unsatisfied. Plaintiff in error stated to the deputy sheriff, that he did not want the execution enforced against Dunlap, but against Sanford, and that there was an understanding with Dunlap, the nature of which was not stated. This witness states, that when the execution was in his hands, Dunlap was running a planing mill, and that plaintiff in error said, that he did not wish to break up Dunlap & Colburn, but wanted the money made of Sanford. Benson testifies, that he saw

plaintiff in error, in reference to his judgment liens on the property in controversy, and was prepared and would have redeemed the property, if Hurd had not agreed to release it. That plaintiff in error said he did not regard his judgments as liens on this property. This witness states, that Dunlap had previously informed him, that the object of the judgments was to collect the amount from Sanford, the amount which Sanford had agreed to pay for Hurd, and that in a conversation, Hurd acquiesced in Dunlap's statement.

It also appears, that after Hurd obtained his judgments, he by agreement postponed his lien on a portion of Dunlap's property, to notes held by Davenport and Otis, to about the sum of eleven hundred dollars, when they purchased it at a trustee's sale. The judgments are shown to have been a prior lien to the trust deed, given to secure the notes; yet Hurd permitted the notes, by agreement, to be paid by a sale of the property freed of the lien.

When Blaney purchased this property subject to the lien of Hurd's judgments, and Dunlap had other property out of which they could have been satisfied, could Hurd stay a levy and sale of such property, and hold that purchased by Blaney liable for their satisfaction? Or could he, after Blaney had purchased, voluntarily release his lien on other property in favor of Davenport and Otis, and still retain his lien on the property purchased by Blaney? Blaney purchased with constructive notice that the property was liable to sale for the satisfaction of these judgments. In making the purchase he ran the risk of having to redeem, satisfy the judgments, or procure a release of the liens.

But was it fair and equitable for plaintiff in error to voluntarily release his lien upon other real estate, and permit a sale of the planing mill and other property of the defendants in execution, and thus impose the whole burthen upon Blaney? We think not. When Blaney left an abundance of property to satisfy the judgments, he committed no fraud upon plaintiff in error. And having had no actual notice of the lien, he had strong claims upon the chancellor for relief, unless he acted recklessly or with a great degree of carelessness in

making the purchase. And his grantee would succeed to all of his rights. Whilst a court of equity has no right, under such circumstances, to release the property altogether from the lien of the judgment, it has a right to compel a judgment creditor to first resort to and exhaust all other property held by the debtor subject to the lien, before resorting to the property thus purchased.

After Blaney purchased, and before the other property of Dunlap had been discharged from the lien, if he had been threatened by an execution, there cannot be a doubt that by bill filed for that purpose, he might have compelled the sale of the other property before resorting to his. And it is upon the principle of marshaling assets, as applied to the administration of estates, the satisfaction of mortgages and other liens. The principle is, that when there exists two or more funds, and there are several claims against them, and at law one of the parties may resort to either fund for satisfaction, but the other party can resort to only one; courts of equity exercise the authority of marshaling the funds, and by this means compel the party having the right to look to both funds, to resort to that upon which the other has no claim, and thus enable the party who has but one remedy, to receive satisfaction. This rule is never applied except where it can be done without injustice to the creditors, or other parties interested, or the common debtor. In this case no wrong can result to Dunlap, because he sold without reference to this lien. He has received the value of the premises.

It produces no injury or injustice to Hurd, as he had the means of satisfaction, after Blaney became the purchaser, but permitted it to be lost, by having his executions returned not satisfied. He postponed his prior lien to the satisfaction of Davenport's notes, for a larger amount than the judgments. He had the means of collecting his judgments, but not only neglected but refused to do so, when it would have produced no injury to Dunlap's grantees. By the return of his executions, and releasing, by agreement, other property to enable Davenport to collect his debts, it may be safely inferred that Hurd intended to release this property from liability to dis-

charge his judgments. This presumption is strengthened by his agreement with Benson to release it, and by that agreement prevented a redemption. Again, his declaration to the deputy sheriff, that he did not want the executions satisfied out of Dunlap's property, supports this view. When all of the evidence is considered, there seems to be no doubt that Hurd is estopped from proceeding against this property, to obtain satisfaction.

This view of the case renders it unnecessary to discuss the question of Dunlap and Colburn as witnesses, or the validity of the judgment.

The decree of the court below is affirmed.

*Decree affirmed.*